[No. 5059.]
[No. 2625 C. A.]

## WILLIAMS v. THE SLEEPY HOLLOW MINING COMPANY.

1. **Practice in Civil Actions—Submission of Facts to Jury.**

   Where the facts, though undisputed, are such that honest men may honestly differ as to the conclusions to be drawn therefrom, the matter should be submitted to the jury.—P. 68.

2. **Practice in Civil Actions—Negligence—Question for Jury.**

   Negligence in a particular case is generally a matter for the jury to determine, and it is always so when the measure of duty is ordinary and reasonable care. In such cases, the standard of duty is variable.—P. 69.

3. **Master and Servant—Duty of Master to Furnish Safe Place in Which to Work.**

   An employer must exercise ordinary care to provide a reasonably safe place in which the employee may perform the services required of him. It is his duty to use diligence to keep his place in a reasonably safe condition, so that the servant may not be exposed to unnecessary risks. The care and diligence required differ as circumstances differ, but in all cases it is such as a reasonably prudent man would exercise under like circumstances in order to protect the persons of his employees from destruction or injury.—P. 69.

4. **Master and Servant—Duty of Master—Degree of Care in Furnishing Safe Place in Which to Work.**

   A far higher degree of care is necessary in the case of an employer whose employees are far under ground, with but scant means of escape in case of danger, than where the employees are not subject to unseen dangers, or are in such a position that escape may be readily effected. The master is bound to use such care as circumstances demand from a reasonably prudent man; and if he fails to do so, he is negligent.—P. 69.

5. **Master and Servant—Duty of Master to Furnish Safe Place in Which to Work—Dangers Patent and Latent.**

It is the duty of the master to furnish a safe place in which the servant is to perform his labor. It must not alone be safe from such dangers as are patent, but also from such as are latent; not alone from those in the place, but from such extraneous matters as menace its safety, and which could be ascertained upon reasonable inquiry.—P. 70.

6. **Master and Servant—Mines and Mining—Duty of Master to Furnish Safe Place in Which to Work.**

A mining company, knowing of the existence of water in a neighboring mine in such quantities as to become dangerous to its employees, is in justice bound to make such investigations as would suggest themselves to one using ordinary care and prudence; and if, upon making such investigations, it learns that there is danger of the mine becoming flooded, it then becomes its duty to make such provisions for the safety of its employees as would occur to a person of ordinary prudence, or to inform the employees of the impending danger so that they may assume the risk or waive the negligence of the master.—P. 70.

7. **Practice in Civil Actions—Master and Servant—Negligence of Master—Question of Law—Question of Fact for Jury—Nonsuit—Directed Verdict.**

Whether a mining company, knowing of the existence of water in a neighboring mine in such quantities as to become dangerous to its employees, used ordinary care to prevent the mine from becoming flooded and made reasonable provisions for the safety of its employees, cannot be determined as a matter of law, for what may be negligence under some circumstances and conditions, may not be under others. It is not a fact to be testified to, but can only be inferred from the res gestae; hence, it may generally be said to be a conclusion of fact to be drawn by the jury under proper instructions from the court, and it is always so where the conclusion is fairly debatable or rests in doubt; and it is only where there is an entire absence of testimony tending to establish the case that a nonsuit may properly be ordered or a verdict directed.—P. 70.

8. **Practice in Civil Actions—Master and Servant—Negligence of Master—Evidence Sufficient for Jury.**

In an action for damages for the death of an employee in a mine, caused by flooding, evidence reviewed and held sufficient to submit to the jury to determine the alleged negligence of the employer.—P. 72.

9. **Practice in Civil Actions—Master and Servant—Contributory Negligence—Evidence Sufficient for Jury.**

In an action for damages for the death of an employee in a mine caused by flooding, evidence reviewed and held sufficient to submit to the jury to determine the alleged contributory negligence of the employee.—P. 73.

10. **Practice in Civil Actions—Master and Servant—Negligence —Burden of Proof.**

In an action for damages for the death of an employee in a mine, caused by flooding, the employer has the burden of proving that the employee knew of the danger; and plaintiff, to recover, need not prove that the employee did not know of the danger, or that the employer had not informed him of its existence.—P. 76.

11. **Practice in Civil Actions—Master and Servant—Death of the Servant—Assumption of Risk—Question for Jury.**

In an action for damages for the death of an employee in a mine, caused by flooding, evidence reviewed and held sufficient to submit to the jury to determine the alleged assumption of risk by the employee.—P. 76.

12. **Master and Servant—Comparative Negligence of Master.**

Where a servant, knowing the hazard of the employment and the manner in which the business is conducted, is injured while employed in such business, he cannot maintain an action against the master on account of such injury, merely because he may be able to show that there was a safer mode in which the business might have been conducted, and that, if it had been conducted in that manner, he would not have been injured. —P. 76.

13. **Practice in Civil Actions—Master and Servant—Negligence —Evidence.**

In an action for damages for the death of an employee in a mine, caused by flooding, evidence of the lack of ladders and bulkheads in the mine at places where they should have been, is admissible for the purpose of showing that, if the defendant knew, or, in the exercise of ordinary care should have known, of the existence of such danger, it further neglected to exercise reasonable care to make the place ordinarily safe.—P. 77.

14. **Practice in Civil Actions—Evidence—Stenographer's Transcript.**

Where, on the second trial of a cause, it was shown that witnesses who testified at the former trial were dead or absent, although such former testimony was taken by a stenographer and certified to be correct, their testimony was properly excluded

in the absence of other proof that it was correctly taken or correctly transcribed, or that the paper offered was a correct copy of the testimony of the witnesses as actually given.—P. 77.

*Error to the District Court of Gilpin County.*
*Hon. A. H. De France, Judge.*

Action by Minnie Williams against The Sleepy Hollow Mining Company. From a judgment for defendant, plaintiff brings error.

*Reversed and remanded.*

Mr. J. WARNER MILLS, Mr. H. A. HICKS and Mr. CLINTON REED, for plaintiff in error.

Mr. MILTON SMITH and Mr. PERCY WERNER, for defendant in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

Defendant was the owner of the Sleepy Hollow mine, situate in Gilpin county. The shaft was about 625 feet deep. The Americus mine, with a shaft about 500 feet deep, joined the Sleepy Hollow on the west. The Mabee-Fisk mine, with a shaft more than 700 feet deep, joined the Americus on the west.

The owners of the Americus ran a level, known as the 390-foot level, eastward into the territory of the Sleepy Hollow. The Americus also ran a level, known as the 490-foot level, westward to within about fifty feet of the Mabee-Fisk line and opposite the point on the Mabee-Fisk property where the ore had been stoped out to the line between the Americus and the Mabee-Fisk, leaving fifty feet between the end of the 490-foot Americus level and this stoped ground.

There had been a level known as the Fraser drift run from the Mabee-Fisk property to the eastward, extending into the Americus property at a

point below the Americus level, running parallel with it. A body of ore had been taken from this Fraser drift upon the Americus property, so that the distance between the upper portion of the stope from which the ore was taken to the bottom of the Americus tunnel was only about four feet, and the character of this rock in the intervening space appears to have been loose, veinous matter.

The defendant made an upraise from its 400-foot level to connect with the end of the 390-foot level of the Americus, which extended into the Sleepy Hollow property, so that the Sleepy Hollow and the Americus mines were connected at a point about 400 feet from the surface of the ground, and the Americus and Mabee-Fisk properties were connected with the exception of the few feet of veinous matter lying between the Fraser drift and the 490-foot level of the Americus property.

The Mabee-Fisk mine became filled with water. The superintendent and manager of defendant company was warned of the presence of this water, and he caused his foreman and one of the employees, Williams by name, who was a brother of decedent, to visit the Mabee-Fisk shaft for the purpose of determining the extent to which it was filled with water. This foreman and Williams went down the Mabee-Fisk shaft to the Fraser drift, and at that time found that the water was some sixteen feet below the drift. They saw the Fraser drift, but made no investigation as to how far it extended eastward.

The water continued to rise in the Mabee-Fisk shaft, and the superintendent of that property continued to inform the superintendent of the Sleepy Hollow property of the extent of the water. This continued from time to time until the water in the Mabee-Fisk shaft had reached a point about 200 feet above the Americus 490-foot level, at the place where

there were only a few feet of rock between that level and the Fraser drift.

At about this time the superintendent of defendant was again cautioned by the superintendent of the Mabee-Fisk property, and was told by such superintendent that the defendant's employees would be drowned shortly unless some precautions were taken. In none of these conversations was there any mention made of the fact that the Fraser drift extended into the Americus property and had been stoped out so closely to the Americus 490-foot level.

It appears that this defendant's superintendent rested under the belief that there were fifty feet of matter between the Mabee-Fisk property and the Americus, so that the water would have to break through this fifty feet of stone before it could reach the Americus property and before it could reach defendant's employees.

It nowhere appears in the testimony that defendant's agents knew that the Fraser drift had extended into the Americus property. It does appear, however, that Carbis, defendant's foreman, who went into the Mabee-Fisk shaft for the purpose of measuring the water, saw the Fraser drift and saw that it extended in the direction of the Americus property, but made no investigation to determine its extent.

Williams, the deceased, talked with his brother, who was defendant's timber boss—that is, had charge of the timbering in defendant's property—and told him that he had heard at Black Hawk, a town near by, that the lives of employees in the Sleepy Hollow property were in danger by reason of this water. The brother did not think so, because of the distance existing, as he supposed, between the Americus workings and the Mabee-Fisk workings.

A few days after this conversation the water broke through from the Fraser drift, running through the Americus property and into the Sleepy Hollow property, and Williams was drowned.

This action was brought by Minnie Williams, the widow of deceased.

At the trial, after plaintiff had proved the foregoing facts, the trial court directed the jury to return a verdict for the defendant, and in doing so stated that before plaintiff could recover she would have to prove that there was danger; that it was known to the defendant; that it was not known to deceased, and that defendant had not warned the deceased of this danger; that if there is a failure or want of proof upon either of these conditions, then a verdict should be directed for the defendant.

A writ of error was prosecuted assigning the direction of the verdict as error, as well as some other alleged errors occurring in the course of the trial.

We cannot say that as a matter of law the defendant was or was not negligent in failing to make such examination of the adjoining premises as would lead it to a full understanding of existing conditions. There is no dispute as to the facts in this case, but it is over the conclusion to be drawn from the facts that the controversy arises, and it is the rule in this state that if the facts are such that honest men might honestly differ as to the conclusions to be drawn therefrom, then the matter should be left to the jury. —*Empson Packing Co. v. Vaughn,* 27 Colo. 71; *Solly v. Clayton,* 12 Colo. 33; *Railway Co. v. Martin,* 7 Colo. 599.

The same rule is announced by U. S. supreme court in *Ry. Co. v. Stout,* 17 Wallace 665, wherein it is held that even though the facts are not disputed, but are such that different minds might honestly

draw different conclusions from them, the case must be left to the jury for their determination.

Negligence in a particular case is generally a matter for the jury to determine, and it is always so when the measure of duty is ordinary and reasonable care. In such cases the standard of duty is variable. —*Cunningham v. U. P. Ry. Co.*, 4 Utah 206; *W. C. & P. Ry. Co. v. McElwee*, 67 Pa. St. 315.

Defendant seems to argue that because the water was located at some distance from this property and was an extraneous cause of danger, defendant was under no obligation to make an investigation as to the extent of this danger. To this we cannot agree as a legal proposition.

The employer must exercise ordinary care to provide a reasonably safe place in which the employee may perform the services required of him. It is his duty to use diligence to keep his place in reasonably safe condition so that the servant may not be exposed to unnecessary risks. The care and diligence required differ as circumstances differ, but in all cases it is such as a reasonably prudent man would exercise under like circumstances in order to protect the persons of his employees from destruction or injury.

A far higher degree of care is necessary in the case of an employer whose employees are far under ground, with but scant means of escape in case of danger, than where the employees are not subject to unseen dangers or are in such a position that escape may be readily effected. The master is bound to use such care as circumstances demand from a reasonably prudent man. If he fails to do so, he is negligent. In actions like the present one, questions of negligence are for the jury. The ordinary care which the parties are to use in the discharge of their respective duties so varies with the situation of the

parties, their knowledge or means of knowledge, the surrounding circumstances of each. particular case, the measurement of which depends so much upon the knowledge and experience of practical men in practical affairs, that it has long been the policy of the law to submit the question of reasonable care to the judgment of a jury. It is only when the facts are undisputed and are such that reasonable men can honestly draw but one conclusion from them that the court should consider the question of negligence one of law and not of fact.—*U. P. Ry Co. v. Jarvi*, 53 Fed. 68.

It is the duty of the master to furnish a safe place in which the servant is to perform his labor. It must not alone be safe from such dangers as are patent, but also from such as are latent; not alone from those in the place, but from such extraneous matters as menace its safety and which could be ascertained upon reasonable inquiry.

Appellee, knowing of the existence of the water in the neighboring mine in such quantities as to become dangerous to its employees, was in justice bound to make such investigations as would suggest themselves to one using ordinary care and prudence; and if, upon making such investigation, it learned that there was danger of the mine becoming flooded, it then became its duty to make such provision for the safety of its employees as would occur to a person of ordinary prudence, or to inform the employees of the impending danger so that they might assume the risk or waive the negligence of the master. The standard of duty in cases of this character is variable. It cannot be determined as a matter of law what is and what is not a compliance with the duty of one who is bound to exercise ordinary care under the circumstances. What may be negligence under some circumstances and conditions may not be under

others. It is not a fact to be testified to, but can only
be inferred from the *res gestae*—from the facts given
in evidence; hence it may generally be said to be a
conclusion of fact to be drawn by the jury under
proper instructions from the court. It is always
so where the conclusion is fairly debatable or rests
in doubt. It is only where there is an entire absence
of testimony tending to establish the case that a non-
suit may properly be ordered or a verdict directed.
—*Langhoff v. Ry. Co.*, 19 Wis. 515; *Dorsey v. Phil-
lips & Colby Const. Co.*, 42 Wis. 600.

In the case of *Railroad Co. v. Van Steinburg*,
17 Mich. 120, it was said by Chief Justice Cooley:

"The case, however, must be a very clear one
which would justify the court in taking upon itself
this responsibility. For when the judge decides that
a want of due care is not shown, he necessarily fixes
in his own mind the standard of ordinary prudence,
and, measuring the plaintiff's conduct by that, turns
him out of court upon his opinion of what a reason-
ably prudent man ought to have done under the cir-
cumstances. He thus makes his own opinion of
what would be generally regarded as prudence a
definite rule of law. It is quite possible that if the
same question of prudence were submitted to a jury
collected from the different occupations of society,
and perhaps better competent to judge of the com-
mon opinion, he might find them differing with him
as to the ordinary standard of proper care. The
next judge trying a similar case may also be of a
different opinion, and, because the case is not clear,
hold that to be a question of fact which the first has
ruled to be one of law. Indeed, I think the cases
are not so numerous as has been sometimes supposed
in which a judge could feel at liberty to take the
question of the plaintiff's negligence away from the
jury. The judge, it is said in one case, is not bound

to submit to a jury the propriety of a particular course, when it is perfectly notorious that all prudent men conduct their own affairs differently. The uniformity of the conduct of business men becomes a rule of law.

"But while there is any uncertainty, it remains a matter of fact for the consideration of the jury.— *Briggs v. Taylor*, 28 Vt. 183. The difficulty in these cases of negligent injuries is, that it very seldom happens that injuries are repeated under the same circumstances; and, therefore, no common standard of conduct by prudent men becomes fixed or known. In *North Pennsylvania R. R. v. Heilman*, 49 Penn. 63, it is said: 'That what constitutes negligence in a particular case is generally a question for the jury and not for the court,' is undoubtedly true, because negligence is want of ordinary care. To determine whether there has been any, involves, therefore, two inquiries: First, what would have been ordinary care under the circumstances; and second, whether the conduct of the person charged with negligence came up to that standard. In most cases the standard is variable, and it must be found by a jury. But when the standard is fixed, when the measure of the duty is defined by the law, entire omission to perform it is negligence. In such a case the jury have but one of these inquiries to make. They have only to find whether he, upon whom the duty rests, has performed it. If he has not, the law fixes the character of his failure and pronounces it negligence."

The facts in this case, being such that reasonable men might honestly disagree on the question as to whether or not the defendant was guilty of negligence in failing to exercise ordinary care and prudence, it should have been submitted to the jury.

It is also contended by defendant in error that the deceased was guilty of contributory negligence. The foregoing reasoning to a large extent applies to the doctrine of contributory negligence. It is only in the clearest cases that the court should usurp the functions of the jury, in determining questions of negligence or contributory negligence.—*Moffatt v. Tenney,* 17 Colo. 191.

The record in this case does not disclose such a state of affairs as would warrant us in saying, as a matter of law, that the deceased was guilty of contributory negligence.

We now come to the proposition as to whether or not it must affirmatively appear from the plaintiff's testimony that deceased did not know of the existence of the danger and that it must affirmatively appear from plaintiff's testimony that defendant had not informed the deceased of the impending danger.

The doctrine announced by the learned judge who tried this case below is supported by eminent authority. It is reasoned that the negligence of the employer does not alone consist in failing to provide a safe place, but that the negligence consists in providing an unsafe place in which the employee shall work without being informed as to the danger.

The doctrine as laid down by Wood on Master and Servant, § 808, is that a servant, in order to recover, is called upon to establish three propositions: first, that the appliance was defective; second, that the master had notice thereof, or knowledge, or ought to have had; third, that the servant did not know of the defect.

In Bailey on Masters' Liability for Injuries to Servants, at page 112, note 1, it is said:

"To show negligence in the master, it must appear that the danger was such that the plaintiff

would not be presumed to know it, and that the master did not give him information of it.''

The doctrine as laid down by these two authors appears to be the rule adopted in the following cases: *Pittsburg C. C. & St. L. Ry. Co. v. Woodward*, 36 N. E. (Ind. App.) 442; *Lynch v. Chicago, St. L. & P. R. Co.*, 36 N. E. (Ind. App.) 46.

There are many more Indiana cases to the same effect. While the earlier ones regarded the employee's knowledge of a defect as an element of contributory negligence, the latter case fixed it as an independent factor of plaintiff's case, the want of which must be alleged and proved, separate and distinct from one of contributory negligence.

The same rule appears to have been adopted in Missouri.—*Musick v. Dold Packing Co.*, 58 Mo. App. 322 and cases there cited.

Also in West Virginia.—*Johnson v. Chesapeake & Ohio Ry. Co.*, 36 W. Va. 77.

On the other hand, it is said in 14 Am. & Eng. Enc. of Law, at page 844, that the burden of proving that an injured servant had knowledge of an obstruction or defect is on the employer. This rule is adopted in the following cases:—*Hulehan v. Green Bay, Winona & St. P. Ry. Co.*, 68 Wis. 520; *Gulf, Colo. & Santa Fe R. Co. v. Royal*, 16 Tex. App. 88 and cases cited; *Alexander v. Central L. & M. Co.*, 104 Cal. 533; *Connolly v. Waltham*, 156 Mass. 370; *Thompson v. Gt. N. Ry. Co.*, 70 Minn. 219; *Lexington & Carter Co. Min. Co. v. Stephens, Adm'r*, 47 S. W. 321.

In *Magee v. N. P. C. R. Co.*, 21 Pac. (Cal.) 114, it is said:

''The complaint for injuries need not state that the defects causing the accident were unknown to plaintiff, as such fact is matter of defense.''

In *Greenleaf v. Ill. Central R. R. Co.*, 29 Ia. 46, it is said:

"If it is claimed that the injured employee knew of the danger, this knowledge by the employee and that the service was commenced or continued by him with such knowledge, must be shown by the defendant. The burden in such cases is put upon the employee, but he is not bound to show, in the first instance, his lack of knowledge."

In *Balhoff v. Mich. Central R. Co.*, 65 N. W. (Mich.) 594, it is said:

"The intestate's actual knowledge can neither be proved nor disproved conclusively, as he is dead. All that is left is to show the surroundings and from them we cannot say that he knew, or ought to have known, that there was a low place in the track at that point. He may have known it. We might perhaps say that he probably did know it, but it would still be for the jury to determine the fact."

In *Dallemand v. Saalfeldt*, 51 N. E. (Ill.) 645, it is said:

"In an action for injuries received by using an appliance, the burden is on the master to show the servant knew the danger incident to its use."

"Where the servant shows that the injury he received was in consequence of an increased risk, one not ordinarily incident to the employment, growing out of the master's negligence, the burden of proof is upon the master to show that the servant knew of and understood the increased danger."—*Swoboda v. Ward,* 40 Mich. 424, citing Cooley on Torts, 661.

So in *Lee v. Reliance Mills Co.*, 43 Atl. (R. I.) 536, it was held that where an employee was injured by reason of defective machinery, the fact that plaintiff knew of the danger and continued to work without objection, assuming the risk was a matter of defense.

In *Buckley v. Port Henry Iron Ore Co.,* 2 N. Y. Supp. 133, it was held that no negligence was imputed to the deceased, except that he knew all about the mine and took the risk. It was held that deceased only assumed such risk as is usual to mining and not such as the mine owner might have avoided by proper inspection. It was for the jury to determine whether the deceased came to his death from the risks which he assumed or from those which the defendant should have protected him against.

It is thus seen that the weight of authority upon where the burden of proof lies as to the knowledge or lack of knowledge of the employee as to latent dangers is that it is upon the defendant. We therefore think that in this particular case the court went too far in taking the question away from the jury. The question of assumption of the risk and knowledge or lack of knowledge of the deceased should have been left to the determination of the jury under appropriate instructions.

There was some evidence which tended to show that the deceased knew of the existence of the water, but as to whether he knew, or ought to have known, all of the conditions connected with the existence of this water which together produced the danger, is a matter which should have been determined by the jury as a matter of fact and not by the court as a matter of law.

There are two other questions raised by the plaintiff in error which are not material to the determination of this case, but, inasmuch as it may be retried, we will allude to them.

Error is assigned because evidence of the lack of ladders and bulkheads, at places where plaintiff contends they should have been, was excluded. This was error. The rule is, if a servant, knowing the hazard of the employment and the manner in which

the business is conducted, is injured while employed in such business, he cannot maintain an action against the master on account of such injury merely because he may be able to show that there was a safer mode in which the business might have been conducted, and that if it had been conducted in that manner he would not have been injured.—*Naylor v. C. & N. W. Ry. Co.*, 53 Wis. 664; *Sullivan v. India Mfg. Co.*, 113 Mass. 396.

In order to justify the court in excluding this testimony, it would have to appear affirmatively that deceased had knowledge of the danger occasioned by the presence of the water as well as the absence of ladders and bulkheads. The rejected testimony was admissible for the purpose of showing that if it is found that defendant knew, or in the exercise of ordinary care should have known, of the existence of danger, it further neglected to exercise reasonable care to make the place ordinarily safe.

It appears that this is the second trial of this action, and at the former trial testimony of witnesses was taken by a stenographer and by him reduced to writing and certified to as correct. At the time of the last trial some of those witnesses were dead and some were absent.

The plaintiff offered to prove by the transcript made by the stenographer the testimony given by deceased and absent witnesses at the previous trial. There was no proof that the testimony was correctly taken or correctly transcribed or that the paper offered was a correct copy of the testimony of the witnesses as actually given, other than the certificate of the stenographer. This offer was rejected. There was no error in the ruling of the court in this respect.

It is true that in *Emerson v. Burnett*, 11 Colo. App. 86, a transcript of the testimony taken by the stenographer was permitted to be used, but in that

case it was agreed that the testimony had been correctly transcribed. In this case it was not agreed that the testimony was correctly transcribed.

In *Chicago, St. P., M. & O. Ry. Co. v. Myers,* 80 Fed. 365, the transcript was admitted, but in that case it was confessedly correct.

The cases which hold that the transcript of the testimony at a previous trial may be introduced in a subsequent trial are those where the stenographer is called and testifies to the accuracy of the transcript, where the testimony has been preserved by a bill of exceptions, settled by the trial court, or where it is agreed by the parties that the transcript is correct. We have been unable to find any authority for the admission of testimony of this character when the verity of the transcript has not been determined.

For the above reasons, the judgment of the district court will be reversed and the cause remanded.

*Reversed and remanded.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE GODDARD concur.